IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RANDY GIBSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: 07-C-2312 |
| v. | ) |
| | ) Suzanne B. Conlon, Judge |
| MICHAEL J. ASTRUE, Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Randy Gibson seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act ("the Act"), 42 U.S.C. § 405(g). Gibson moves for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, Gibson's motion for summary judgment is granted in part and this case is remanded to the Social Security Administration.

**PROCEDURAL BACKGROUND**

On November 30, 2004, Gibson filed an application for DIB, alleging disability for various impairments beginning January 26, 2000. R. 68. His application was initially denied. R. 56. After filing for reconsideration, his application was denied again. An administrative hearing was then conducted. R. 246-316. Gibson and his partner, Dawn Wilson, appeared and testified at the hearing, as did Walter Miller, M.D., an impartial medical expert, and William Schweihs, an impartial vocational expert. The administrative law judge ("ALJ") denied Gibson's

application. R. 12. The Appeals Council denied Gibson's request for review, leaving the ALJ's decision as the final decision of the Commissioner. R. 5.

## BACKGROUND

### I. Physical History

Gibson is 42 years old. R. 68. He completed eighth grade and has no vocational training. R. 253-54. Beginning in 1983 (when Gibson was 19) until 2000, Gibson worked as a shipping clerk at a Dart Container factory. R. 250. His job consisted primarily of manual labor. R. 250. On January 26, 2000, Gibson sustained a back injury on the job when he tripped over an object on the dock and fell backwards. R. 94, 177. After a short period, he returned to the job, but was dismissed due to insubordination. R. 212. Thereafter, he tried to take on odd-end jobs but ceased doing so in 2001. R. 255-56.

#### A. Gibson's Testimony

At the ALJ hearing, Gibson testified that since January 26, 2000, he has experienced tingling or burning down the back of his legs, severe back pain, headaches, hand tremors, and unbearable pain in his feet, all stemming from the work injury. R. 262. He testified to suffering from frequent muscle spasms, and pain so great that he must periodically lie down to ice his back three to four times a day. R. 270. He testified he could not pick items up off of the floor and that repetitious activity resulted in pain. R. 274-75. Gibson explained these physical symptoms led to depression and periods of blurred vision. R. 275, 277. He testified he is no longer able to work without pain, much less participate in everyday activities such as driving and household chores. R. 262-263.

#### B. Medical Evidence

2

Following Gibson's injury, he was evaluated on February 9, 2000 by Brian Anderson M.D., who noted that an MRI of Gibson's back exhibited degenerative disc disease and herniation of the L5-S1 disc. R 166. This was followed up by various evaluations by Castle Orthopaedics and Sports Medicine, S.C. ("Castle"). On April 18, 2000, a report by a Castle specialist noted Gibson could return to work with restrictions that he refrain from stooping, bending, twisting, jerking, or lifting anything in excess of twenty-five pounds. R. 168. Then, on May 16, another physician Gary Skaletsky M.D. evaluated Gibson and found his "strength is subjectively diminished in the left leg because of pain," and that there was no atrophy or fasciculation in his legs. R. 178. Dr. Skaletsky also evaluated the MRI conducted on February 9th, and agreed Gibson had lumbar radiculopathy and a herniated nucleus pulposus on his left side at L5-S1. R. 178. After this evaluation, Gibson sought steroid injections in his back, which were unavailing and therefore terminated. R. 287.

Dr. Skaletsky examined Gibson again on December 27, 2002. Dr. Skaletsky noted that Gibson visited an orthopaedic surgeon Dr. Walsh, who informed Gibson he could return to work without any restrictions. R. 185. Dr. Skaletsky concluded Gibson's strength was good in all extremities without weakness, fasciculation or atrophy. R. 185. Still, Dr. Skaletsky opined that Gibson was not in optimal condition; exhibited pain with resistence and could only straight leg raise at forty-five degrees bilaterally. R. 185. Dr. Skaletsky gave a prognosis of a full recovery and did not see any harm in Gibson performing odd jobs. R. 186.

After this evaluation, Gibson did not seek any medical treatment for his condition for several years. R. 264. He stated this was due to lack of money. R. 264. Then, in a consultative examination on February 25, 2005, Dr. C.J. Wonais confirmed that Gibson's range of motion in

3

his lumbar spine was limited and that he had a degenerative disc disease. R. 189. The evaluation also indicated Gibson had a moderate degree of difficulty sitting up and getting on and off the examination table, and that his left/right straight leg raises resulted in pain at thirty degrees. R. 189. Otherwise, Gibson exhibited normal grip strength and digital dexterity. R. 189.

A few weeks later on March 19, 2005, Dr. Pilapil Virgilio (a state agency medical consultant) opined that Gibson could perform light work with postural limitations. R. 191. Then, on August 26, 2005, Rafia S. Saleem M.D. conducted an MRI scan of Gibson's lumbar spine and noted that he had degenerative changes, a small central annular tear, and prominent reactive endplate changes in his back. R. 218. The MRI did not indicate evidence of a herniated disc. R. 218.

### C. Medical Expert Testimony

After reviewing Gibson's medical history, medical expert Walter Miller M.D. testified that even though Gibson was diagnosed in 2000 with a herniated disc and a degenerative disc disease, his 2005 MRI indicated there was no evidence of a herniated disc. R. 291. Dr. Miller further opined it was unlikely that Gibson suffered from radiculopathy. R. 291-92. Rather, Dr. Miller testified that Gibson's MRIs consistently showed degenerative changes in Gibson's back, which are symptoms of arthritis. R. 291. Dr. Miller opined it was more likely that Gibson suffered from severe arthritis, and could perform light work. R. 291-93.

With respect to Gibson's herniated disc, Dr. Miller stated that Gibson had likely healed because the 2005 MRI did not reveal a herniated disc. With respect to radiculopathy, Dr. Miller explained it was more likely that Gibson had severe arthritis because the 2005 MRI and other reports could not be "clinically correlated" with radiculopathy, which is a condition affecting

4

nerve roots. R. 291. Dr. Miller stated Gibson did not have any weakness or atrophy in his extremities over time, which are by-products of radiculopathy. R. 291-92. However, Dr. Miller left open the idea that Gibson suffered from radiculopathy in 2000, when Dr. Anderson first gave his impression of Gibson's 2000 MRI. R. 301-02.

### D. Vocational Expert Testimony

Vocational expert William Schweihs testified that given Gibson's age, education, work experience, and his capacity to perform a restricted range of light work, he would be able to perform representative occupations such as an assembler of large objects which are not a conveyer (3,000 to 4,000 such jobs in the regional economy), a packager (2,500 such jobs), a visual inspector (3,000 such jobs), or a gate guard/lobby attendant (3,000 such jobs). Schweihs estimated there are approximately 15,000 to 20,000 light unskilled jobs in the region falling within this profile.

Schweihs admitted most employers would not permit breaks to accommodate Gibson if he had to lie down at will several times a day and ice his back repeatedly throughout the day. R. 312-315.

## II. The ALJ Decision

The ALJ concluded Gibson was not disabled within the meaning of the Act from the onset date to the decision date. R. 18-19. The ALJ found Gibson's medically determinable impairments to be severe, but as of January 26, 2000, those impairments did not meet or equal any impairment listed in Appendix 1, Subpart P, Regulation No. 4. R. 14-15. The ALJ concluded that Gibson had the residual functional capacity to perform light restricted work. The ALJ specified: "[Gibson] can only occasionally climb ladders, ropes, scaffolds, ramps, stairs,

5

balance, kneel, stoop, crouch, and crawl. He can only occasionally perform tasks requiring fine finger dexterity, due to his reported hand tremors. He must avoid concentrated exposure to hazards such as unprotected heights and dangerous moving machinery." R. 15. The ALJ indicated he considered all Gibson's reported symptoms and the extent to which the symptoms were consistent with the objective medical evidence and other evidence based on 20 C.F.R. 404.1529 and SSRs 96-4p and 96-7p. R. 16.

In addition, the ALJ found Gibson's contentions regarding the intensity, persistence, and limiting effects of the symptoms not entirely credible. The ALJ cited the following supporting reasons: Gibson did not receive the type of medical treatment one would expect from a person who is totally disabled; Gibson's description of the severity of the pain was so extreme it appeared implausible given the evidence; and restrictions from treating doctors were inconsistent with Gibson's claim that he could no longer work. R. 16.

The ALJ adopted the testimony of Schweihs, the vocational expert, in concluding Gibson is capable of making a successful adjustment to other work existing in significant numbers in the national economy. R. 18. The ALJ queried Schweihs as to whether suitable jobs existed in the national economy for Gibson; Schweihs estimated approximately 15,000 to 20,000 light unskilled jobs in the region. The ALJ found this answer to be consistent with the information contained in the Dictionary of Occupational Titles. R. 18. The ALJ concluded Gibson was not disabled under the Act.

## DISCUSSION

### I. Standard of Review

Judicial review of the Commissioner's final decision is limited. The role of the reviewing court is to determine whether substantial evidence in the record as a whole supports the Commissioner's decision to deny benefits. 42 U.S.C. § 402(g); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the record, the court may not reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion, [he] need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v.. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## II. Analysis

To be entitled to disability insurance benefits under the Act, Gibson must establish she is disabled. A person is disabled if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the

following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling ("a listing-level impairment"), (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176; *see* 20 C.F.R. § 404.1520(a)(4)(i)-(v). Gibson has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If Gibson reaches step five, the burden then shifts to the Commissioner to show "the claimant is capable of performing work in the national economy." *Id.* at 886.

At step one, the ALJ found Gibson was not engaged in substantial gainful activity and had not since January 26, 2000, the alleged onset date. R. 14. At step two, the ALJ found Gibson's vertebrogenic disorder and hand tremors were severe impairments. R. 14. At step three, the ALJ found that the impairments did not meet or medically equal any impairment that the Commissioner considered conclusively disabling. R. 15. The ALJ concluded Gibson retained the residual functional capacity to perform a restricted range of light work. R. 15. At step four, the ALJ determined Gibson could not perform her past relevant work. R. 17. At step five, the ALJ found Gibson capable of performing other jobs existing in significant numbers in the national economy. R. 17-18.

Gibson argues the ALJ erred in finding (1) the severity of his medically determinable impairments did not meet or equal those listed in Appendix 1, Subpart P, Regulation No. 4; (2) Gibson was not a credible witness; (3) Gibson has the residual functional capacity to perform light work; (4) Gibson is not prevented from making an adjustment to other work.

## A. The Severity of Gibson's Medically Determinable Impairments

Gibson argues medical evidence establishes that he was impaired under Listing 1.04 of Appendix 1, Subpart P, Regulation No. 4, and the ALJ ignored this evidence at Step 3. Gibson does not specify any particular section of Listing 1.04; there are three different sections pertinent to spinal disorders. The court assumes Gibson refers to Listing 1.04A, which pertains to herniated disc impairments, and provides that an individual is presumptively disabled if his impairment meets the following criteria:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

20 C.F.R. Pt. 404, Subpt. P., App. 1.04(A). The ALJ's one-sentence discussion of this question revealed only the following: "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Notwithstanding Gibson's failure to identify evidence establishing that his impairment satisfies Listing 1.04, it is unclear from the ALJ's sparse analysis as to what evidence was considered in making this assessment. There is nothing in the record on this issue for this court to review. This shortcoming requires a remand on this issue. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

The Commissioner responds that Gibson has the burden to show that his impairments meet each of the requirements in the Listing. *See, e.g., Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). However, all symptoms identified in 1.04A are not necessarily required to be found in order to satisfy application of a listing. *See, e.g.*, 20 C.F.R. § 404.1526 b(1) ("we can find medical equivalence . . . if you have an impairment that is described in appendix 1, but you do not exhibit one or more of the findings specified in the particular listing . . . [w]e will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria."). More importantly, the Seventh Circuit has consistently held that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a "perfunctory analysis," may require a remand. *See Ribaudo*, 458 F.3d at 583; *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *see also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). In *Ribaudo*, for example, the Seventh Circuit remanded a case to the Social Security Administration because the ALJ's decision regarding Step 3 was entirely conclusory and offered no analysis that would enable meaningful judicial review. 315 F.3d at 786. The ALJ did not even mention the specific listings under which it considered the claimant's impairments, nor did the ALJ discuss conflicting evidence. *Id.*

Similarly, the ALJ in this case did not identify the specific listings considered in evaluating Gibson's impairments, nor did the ALJ discuss conflicting evidence. Gibson identifies Dr. Anderson's 2000 report as evidence that he was impaired by a degenerative disc disease and a herniated disc – ailments within the purview of Listing 1.04. Additionally, Gibson identifies other evidence that corroborated Dr. Anderson's report that he suffered from a

herniated disc, including Dr. Skaletsky's May 16, 2000 report and additional reports indicating Gibson's limited motion in straight leg tests. Although the ALJ references this conflicting evidence in his discussion of Gibson's residual functional capacity, at Step 3 there is absolutely no analysis with respect to whether Gibson's impairments satisfy Listing 1.04. *Cf. Sienkiewicz v. Barnhart*, No. 02 C 6332, 2003 WL 22757756, at *6 (N.D. Ill. Nov. 19, 2003) (Anderson, J.) (ALJ adequately incorporated plaintiff's residual functional capacity analysis as support for Step 3 finding), *aff'd*, 409 F.3d 798 (7th Cir. 2005).

The ALJ is not required to mention every piece of evidence in the record, *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004), but his failure here to evaluate any of the evidence that potentially supported Gibson's claim casts doubt as to whether the ALJ undertook any analysis of Step 3 at all. *See Brindisi*, 315 F.3d at 786 (criticizing ALJ's failure to discuss conflicting evidence at Step 3 inquiry including the strongest piece of evidence supporting claimant's case). For this reason, the case must be remanded to the Social Security Administration so the agency can conduct a more thorough analysis of the evidence at Step 3.

### B. Gibson's Credibility

Gibson argues that the ALJ erred in finding that he was not a credible witness. He contends that credibility should be determined by comparing his testimony with the reports submitted by those treating him. The Commissioner responds the ALJ made the credibility determination based on evidence in the record, and that determination should not be disturbed.

To succeed on this ground, Gibson must overcome the highly deferential standard accorded to the ALJ's credibility determination. Because the ALJ is in a far superior position to assess the credibility of a witness, an ALJ's credibility finding is reversed only if it is "patently

wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, the ALJ must abide by the requirements of Social Security Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi*, 315 F.3d at 787. Under SSR 96-7p, "the ALJ's assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on [her] ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." SSR 96-7p.

Significantly, the ALJ did not entirely discount Gibson's credibility. Instead, the ALJ recognized the severity of Gibson's impairments, and limited the credibility determination to the "intensity, persistence and limiting effects" of Gibson's testimony. R. 16. This determination was due to several reasons supported by the record. First, as the ALJ points out, Gibson complained of intense, debilitating pain, yet he received very little medical treatment. Although Gibson cited financial reasons as an explanation, the record does not indicate why Gibson did not seek low cost or no-cost health care for his intense pain.

Second, although the treatment records identify the nature of Gibson's impairment, they do not indicate that Gibson was to be restricted from all work. Some reports suggest that Gibson was permitted to continue working, albeit with restrictions. For example, a specialist from Castle found in April 2000 that Gibson could return to work with a twenty-five pound lifting restriction. R. 168. In 2002, Dr. Skaletsky observed that Gibson's strength was good in all extremities, with no weakness or atrophy, and that he was neurologically stable. R. 185-86. This report suggests Gibson still had the capacity to work.

The ALJ specified it was due to these inconsistencies in the evidence that he did not find Gibson's testimony regarding the severity of his pain "entirely credible." As a result, the ALJ's credibility determination is given deference, as he has "buil[t] an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (internal citation and quotation marks omitted).

### C. Gibson's Functional Capacity

Gibson contends the ALJ's decision regarding his residual functional capacity was improperly based on the opinion of medical expert Dr. Miller, a non-treating physician, and against the weight of the evidence. The ALJ found Gibson to have the residual functional capacity to perform a restricted range of light work, and delineated the types of activities suitable for him. R. 15. The ALJ noted he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4 and 96-7p." R. 15.

Although it is true that the ALJ considered Dr. Miller's opinion evidence pursuant to 20 C.F.R. § 404.1527; SSRs 96-2p, 96-5p, 96-6p, 06-3p, the ALJ offered an independent analysis in determining whether Gibson had a residual functional capacity to perform a restricted range of light work. Dr. Miller's testimony only confirmed the ALJ's assessment.

As the ALJ points out, none of the evidence offered from treating physicians contradicts the conclusion that Gibson can conduct restricted light work. For example, Dr. Anderson's initial report in February 2000 did not indicate whether Gibson was impaired to an extent he was unable to return to work, although it did note that Gibson was under significant pain. R. 238-39.

13

The April 2000 Castle report expressly permitted Gibson to return to work immediately under limitations consistent with the ALJ's findings. R. 168. Dr. Skaletsky also noted in December 2002 that an orthopedic surgeon, Dr. Walsh, told Gibson that he could return to work without any restrictions at all. R. 185. Dr. Skaletsky's assessment concurred, finding that Gibson's "strength is good in all extremities without weakness, fasciculation or atrophy." R. 185. Dr. Skaletsky permitted Gibson to continue performing odd jobs, and gave a prognosis of complete recovery. R. 185-86.

The ALJ's residual functional capacity finding was also supported by Dr. Wonais' February 2005 evaluation, which indicated Gibson's range of motion was normal with the exception of the lumbar spine. Gibson's August 2005 MRI supported the ALJ's finding as it indicated no significant abnormalities and no herniated disc. Dr. Miller noted the 2005 MRI revealed that Gibson's herniated disc likely healed.

Dr. Miller's testimony buttressed the medical evidence in support of the ALJ's finding insofar as it explained that the initial diagnosis of chronic radiculopathy and irritation of the lumbosacral nerve roots was not "clinically correlated" to the medical data. Dr. Miller opined that since symptoms of leg weakness or atrophy were absent, Gibson likely suffered from severe arthritis rather than radiculopathy. R. 292-93. This conclusion led Dr. Miller to believe that Gibson could engage in light work. R. 293.

The ALJ properly referenced this supporting evidence and adequately analyzed the logical bridge of this evidence to his conclusion that Gibson may perform restricted light work. R. 15, 18.

### D. Gibson's Ability to Adjust to Other Work

Gibson argues the ALJ erred in finding Gibson not disabled under 20 C.F.R. § 404.1520(g) and 416.920(g) because that finding was against the weight of objective medical evidence. 20 C.F.R. § 404.1520(g) provides:

> (g) Your impairment(s) must prevent you from making an adjustment to any other work.
>
> (1) If we find that you cannot do your past relevant work because you have a severe impairment(s) (or you do not have any past relevant work), we will consider the same residual functional capacity assessment we made under paragraph (e) of this section, together with your vocational factors (your age, education, and work experience) to determine if you can make an adjustment to other work. (See § 404.1560(c).) If you can make an adjustment to other work, we will find you not disabled. If you cannot, we will find you disabled.
>
> (2) We use different rules if you meet one of the two special medical-vocational profiles described in § 404.1562. If you meet one of those profiles, we will find that you cannot make an adjustment to other work, and that you are disabled.

Gibson essentially repeats the same arguments raised with respect to the ALJ's finding regarding the residual functional capacity determination. He contends the ALJ did not adequately rely on Gibson's testimony or reports by treating physicians. As discussed above, the ALJ's residual functional capacity determination is supported by substantial evidence, and was tailored to the impairments evidenced in Gibson's medical evaluations.

The ALJ's finding that Gibson could make a successful adjustment to other work is supported by substantial evidence. The ALJ questioned the vocational expert as to whether jobs exist in the national economy for an individual with Gibson's age, education, work experience, and residual functional capacity. The ALJ directed the vocational expert's attention to Dr. Virgilio's report regarding Gibson's work limitation recommendations. *See Cass v. Shalala*, 8 F. 3d 552, 555-56 (7th Cir. 1993) ("all that is required is that the hypothetical question be supported

by the medical evidence in the record."); R. 307. The vocational expert responded there are approximately 15,000 to 20,000 light unskilled jobs in the region falling under a profile of jobs. The ALJ found this testimony consistent with the Dictionary of Occupational Titles. R. 18.

Notably, Gibson does not challenge this aspect of the ALJ's decision, but reasserts that the residual functional capacity determination was not supported by the evidence. He claims the ALJ's decision does not resonate with his testimony regarding his need to lie down every hour and ice his back several times a day to relieve pain. However, the ALJ discounted Gibson's credibility with respect to the intensity of his pain, relying instead primarily on the medical reports. Therefore, the ALJ's determination that a successful adjustment to other work can be made by Gibson is supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, Gibson's motion for summary judgment is granted with respect to the ALJ's Step 3 determination. This case is remanded to the Social Security Administration to address the Step 3 analysis regarding whether Gibson's impairments satisfy Listing 1.04. The summary judgment motion is denied in all other respects.

ENTER:

Suzanne B. Conlon
United States District Judge

September 28, 2007